UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.

MARK N. KIRSCH,

               Defendant.

**DECISION AND ORDER**
07-CR-304S (6)

## I.  INTRODUCTION

On March 7, 2014, a jury convicted Defendant Mark N. Kirsch of racketeering conspiracy, Hobbs Act conspiracy, and attempted Hobbs Act extortion.  Kirsch now moves for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure or, alternatively, for a new trial under Rule 33.  For the reasons discussed below, Kirsch's motion is granted in part and denied in part.

## II.  BACKGROUND

On December 18, 2007, a federal grand jury returned a four-count indictment alleging Hobbs Act extortion and conspiracy against five members of the International Union of Operating Engineers, Local 17, AFL-CIO ("Local 17").   (Docket No. 1.) Approximately 16 months later, on April 1, 2008, the grand jury returned an eight-count superseding indictment, which, among other things, added additional counts and additional Defendants, including Kirsch, the long-time president and business manager for Local 17. (Docket No. 4.)

After vigorous pretrial proceedings and the return of a second superseding indictment (Docket No. 280), five defendants went to trial on a seven-count trial indictment

1

(Docket No. 589), beginning on January 13, 2014 (Docket No. 488).  Count 1 charged Kirsch and another defendant with racketeering conspiracy, in violation 18 U.S.C. § 1962(d); Count 2 charged all five defendants with Hobbs Act conspiracy, in violation of 18 U.S.C. § 1951(a); Counts 3-7 charged various defendants with attempted Hobbs Act extortion, in violation of 18 U.S.C. §§ 1951(a) and (2).

The eight-week trial concluded on March 7, 2014.  (Docket No. 585.)  Upon the close of the government's proof, and again after the defendants rested, this Court reserved decision on the defendants' Rule 29 motions.   (Docket Nos. 565, 578.)   The jury subsequently found Kirsch guilty on Counts 1, 2, 5, and 6, but acquitted him on Counts 3 and 7.[1]  (Docket No. 590.)  The jury acquitted Kirsch's co-defendants on all counts against them.  (Docket No. 590.)

Following the verdict, Kirsch timely filed the instant motion for judgment of acquittal or, alternatively, for a new trial, on March 28, 2014.  (Docket No. 610.)  Kirsch seeks judgment of acquittal on all counts of conviction due to insufficiency of the evidence.  He seeks a new trial due to improper jury instructions.[2]

## III.  DISCUSSION

**A.    Kirsch's Rule 29 Motion**

### 1.    Rule 29 of the Federal Rules of Criminal Procedure

Under Rule 29 (a), a court must, upon a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  A

---

[1]Kirsch was not named in Count 4.  (Docket No. 589.)

[2]Kirsch also seeks judgment of acquittal or a new trial based on unsuccessful arguments he made in his pretrial motions to dismiss and various trial submissions.  (See Docket No. 611, p. 3 and Exhibit A.)  Those arguments are denied for the reasons previously stated.

defendant may move for a judgment of acquittal after the government closes its evidence, after the close of all evidence, or after the jury has returned its verdict and been discharged.  <u>See</u> Rule 29 (a) and (c)(1).  A defendant may also renew a previously denied Rule 29 motion, so long as renewal occurs within 14 days after the guilty verdict or discharge of the jury, whichever is later.  <u>See</u> Rule 29 (c)(1).

The making of a motion for a judgment of acquittal before the court submits the case to the jury is not a prerequisite for making such a motion after the jury is discharged.  <u>See</u> Rule 29 (c)(3).  "[W]hen a motion for judgment of acquittal made at the close of the government's case-in-chief is denied and a defendant presents a case, then the evidence put in by the defense will also be considered in deciding a [Rule 29] motion made after the trial ends."  <u>United States v. Truman</u>, 762 F. Supp. 2d 437, 445 (N.D.N.Y. 2011).

A defendant challenging the sufficiency of the evidence bears a heavy burden.  <u>United States v. Hassan</u>, 578 F.3d 108, 126 (2d Cir. 2008); <u>United States v. Finley</u>, 245 F.3d 199, 202 (2d Cir. 2001).  "In evaluating whether the evidence was sufficient to convict a defendant, [a reviewing court] consider[s] all of the evidence, both direct and circumstantial, 'in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government.'" <u>United States v. Velasquez</u>, 271 F.3d 364, 370 (2d Cir. 2001) (quoting <u>United States v. Walker</u>, 191 F.3d 326, 333 (2d Cir. 1999)).

When considering the trial evidence, "the court must be careful to avoid usurping the role of the jury." <u>United States v. Jackson</u>, 335 F.3d 170, 180 (2d Cir. 2003).  The court may not "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." <u>United States v. Guadagna</u>, 183

3

F.3d 122, 130 (2d Cir. 1999) (internal quotation marks and citations omitted).  Determining

the witnesses' credibility falls strictly within the province of the jury.  Guadagna, 183 F.3d

at 129 (noting that the court must defer to the jury even if the evidence would also support,

in the court's opinion, a different result).

A judgment of acquittal is warranted only if the court concludes that the evidence

is non-existent or so meager that no rational trier of fact could find the defendant guilty

beyond a reasonable doubt.  Velasquez, 271 F.3d at 270; Guadagna, 183 F.3d at 130.

The court must consider the evidence "in its totality, not in isolation, and the government

need not negate every possible theory of innocence."  United States v. Cote, 544 F.3d 88,

98 (2d Cir. 2008); see Guadagna, 183 F.3d at 130 ("each fact may gain color from the

others").

### 2.    Racketeering Acts 4A and 5A of Count 1 and Counts 2, 5, and 6: "Unwanted, Unnecessary, and Superfluous Labor"

In Racketeering Acts 4A and 5A of Count 1 and Counts 2, 5, and 6, Kirsch is

charged with extorting or attempting to extort property from various contractors or

employers in the form of "wages and benefits to be paid . . . for unwanted, unnecessary,

and superfluous labor."  (Docket No. 589.)  The parties agree that whether Kirsch's

convictions on these counts are supported by sufficient evidence depends on the meaning

of "unwanted, unnecessary, and superfluous labor."

The government's position (and its theory at trial) is that Kirsch used actual or

threatened violence to force employers to replace non-union workers with union workers.

This, according to the government, constitutes the extortion of wages and benefits to be

paid by an employer or contractor for "unwanted, unnecessary, and superfluous labor,"

4

even though both the non-union worker and the replacement union worker performed tasks wanted by the employer and necessary to the completion of the job.[3]

Kirsch disagrees.  He contends that "unwanted, unnecessary, and superfluous labor" does not extend beyond a union seeking to obtain wages from a contractor without the contractor receiving genuine services in return.  In Kirsch's view, the simple replacement of a non-union worker with a union worker, both of whom perform tasks wanted by the employer and necessary to the completion of the job, does not constitute the extortion of "unwanted, unnecessary, and superfluous labor."

The phrase "unwanted, unnecessary, and superfluous labor" is drawn from the indictment at issue in United States v. Green, where the defendants were charged with attempting to obtain from two employers "money, in the form of wages to be paid for imposed, unwanted, superfluous, and fictitious services of laborers."  350 U.S. 415, 417, 76 S.Ct. 522, 100 L.Ed. 494 (1956).  But Green does not define the phrase "imposed, unwanted, superfluous, and fictitious."

Green is instructive, however, on what "labor" means in the phrase "unwanted, unnecessary, and superfluous labor," as used in the indictment.  At issue in Green was money paid for the *services* of laborers.  Id.  So too is the case here.  With the allegations in Green as the genesis for the government's property allegations here, the term "labor" in the phrase "unwanted, unnecessary, and superfluous labor" must refer to the work to be performed (i.e., *services* of laborers) rather than to a particular laborer.  In other words, the

---

[3]It is undisputed that but for evidence concerning the operation of a compressor for Amstar Painting (Count 2), the labor performed on the various job sites was necessary labor that the employers wanted and needed.  None of the labor was excessive or non-essential.

wages and benefits at issue must have been paid for *work* that was "unwanted, unnecessary, and superfluous," rather than to a particular *individual* who may have been "unwanted, unnecessary, and superfluous." See Green, 350 U.S. at 417.

Some two decades after Green, the United States Supreme Court shed light on the concept of "unwanted, unnecessary, and superfluous labor" in United States v. Enmons, when it discussed its pre-Hobbs Act decision in United States v. Local 807 of Int'l Broth. of Teamsters, Chauffeurs, Stableman and Helpers of Am. and the Third Circuit's decision in United States v. Kemble.  410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973); 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942); 198 F.2d 889 (3d Cir. 1952).

Local 807 involved the operation of delivery trucks to and from New York City.  315 U.S. at 525-26.  Members of Local 807 stopped non-union truck drivers attempting to enter the city limits to deliver merchandise.  Id.  By use of violence and threats of violence, Local 807 members extracted fees from non-union truck drivers to access the city.  Id.  The fees were equal to the regular union rates for a day's work.  Id.  In some instances, Local 807 members took over trucks at the city line, delivered the merchandise into the city, picked up return-trip merchandise, and then returned the truck to the non-union driver back at the city line.  Id. at 526.  In other instances, Local 807 members did not offer to perform any work (or the offer was rejected) or refused to work for the extracted fee when asked to do so.  Id.  In Enmons, the Supreme Court identified this type of work as "unwanted and superfluous" and "unneeded and unwanted."  410 U.S. at 402.

In Kemble, the Third Circuit Court of Appeals found that a union's insistence that one of its members be hired (or the day's wage of a union member be paid) to unload a truck that a non-union truck driver was already being paid to unload constituted "imposed,

6

unwanted, and superfluous services."  198 F.2d at 892.  The Kemble court distinguished

this type of arrangement from "the normal demand for wages as compensation for services

desired by or valuable to the employer."  Id. at 892.

The Second Circuit addressed the concept of "imposed, unwanted, superfluous and

fictitious labor services" in United States v. Robilotto.  828 F.2d 940 (1987).  Robilotto

involved a labor union's requirement that a film production company employ "cover drivers."

Cover drivers were union members hired to "cover" driver jobs performed by non-union

members.  Cover drivers did not work yet were paid union wages.  In discussing these

cover drivers, the Robilotto court found that "it would be difficult to imagine a more obvious

instance of imposed, unwanted, superfluous and fictitious labor services."  Robilotto, 828

F.2d at 945.

Against this backdrop is the Second Circuit's decision in United States v. Mulder.

273 F.3d 91 (2d Cir. 2001).  Mulder involved a labor coalition known as Brooklyn Fight

Back.  Members of this coalition relied on their reputation for violence and other means to

secure jobs for minorities, who were then required to pay a portion of their wages to the

coalition as a kick-back.  Coalition members also secured "no-show" jobs for themselves

as "coalition coordinators," whose only function was to fend off rival labor coalitions.

Coalition coordinators performed no actual work on the job site.

In determining whether the district court correctly instructed the jury on the Enmons

labor exception to Hobbs Act liability, the court, citing Enmons, reiterated that "the use of

force for 'the achievement of illegitimate objectives by employees or their representatives,

such as the exaction of personal payoffs, or the pursuit of 'wages' for unwanted or fictitious

services,' is not exempt from the [Hobbs] Act."  Mulder, 273 F.3d at 104.  The court further

7

noted that the labor exception would not apply "if the coalition creates not only the spur to hire a minority worker but also the need to hire an otherwise unneeded worker or coconspirator by its violence or threats of violence." Id. at 105, n. 2. This is because the labor exception "assumes that the employer genuinely needs workers . . . ." Id.

The government relies principally on Mulder to support its position that "unwanted, unnecessary, and superfluous" includes replacing non-union workers with union workers. In doing so, it seizes on a passage in the court's discussion of the sufficiency of the evidence. There, the court recounted that the superintendent of a job site for Tully Construction hired two workers, one of which he laid off and replaced with another worker that he believed to be sent by the coalition. In another incident, Tully Construction replaced one coalition worker with another. Similar "replacement" occurred at Defoe Construction. The government ignores, however, that the replaced workers in Mulder were themselves unnecessary: the employer did not want to hire them to begin with but did so to stave off disruption. See Mulder, 273 F.3d at 111 (noting that the superintendent "hired two workers at Johnson's direction, *although he needed neither worker*, because sometimes they stop the job, they push people around) (emphasis added).[4] Thus, Mulder involves the replacement of one unwanted coalition worker performing unneeded work with another unwanted coalition worker performing unneeded work. It does not involve the replacement of a non-union worker with a union worker, each of whom fills a genuine need

---

[4]The government reads Mulder to suggest that Tully Construction did not want to hire these two workers because they were troublemakers. (Government Memorandum, Docket No. 620, p. 7.) But nothing in Mulder suggests that the two individual workers possessed undesirable traits. Rather, they were hired solely to avoid the consequences of not hiring them: job stoppage and intimidation by the coalition. See Mulder, 273 F.3d at 111. In other words, although he needed neither worker, the superintendent hired both so that the coalition would not stop the job or push people around. Id.

of the employer, which was the proof in this case.

The government also relies on Local 807 and Kemble.  But as discussed above, those cases involved *additional* workers, not *replacement* workers.  For example, the union truck drivers in Local 807 did not replace the non-union drivers.  Even in those instances when the union members took over the trucks and drove them into the city, they returned the trucks to the original drivers who then continued on.  And in Kemble, the union member unloading the truck did not replace the truck driver; the truck driver remained and eventually continued on his way after the delivery.  Nothing in Local 807 or Kemble suggests that the temporarily displaced non-union worker was either replaced by a union member or not paid.  Thus, the government's position is not supported by the cases it cites.

The government's theory also suffers because its acceptance would eliminate any difference between the two distinct property allegations in the indictment.  If, as the government contends, "unwanted, unnecessary, and superfluous labor" includes wages paid to a union worker once he replaces a non-union worker, then there is no distinction from the other property allegation in the indictment—the wages and benefits to be paid by employers pursuant to labor contracts with Local 17.  This is because, if the union is successful in wrongfully obtaining the replacement of a non-union worker with a union worker, then the wages and benefits obtained are pursuant to the union labor contract, not because it has secured wages and benefits for unwanted, unnecessary, and superfluous labor.

Moreover, the government has defined the property at issue in these counts in the conjunctive.  That is, wages for "unwanted, unnecessary, *and* superfluous labor."  The use

9

of extortion to force an unwilling employer to replace a non-union worker with a union worker falls outside of the Enmons exception and is punishable under the Hobbs Act. Indeed, the government's allegations in the state law predicates address this very type of activity by identifying the property at issue as the wages and benefits to be paid by contractors or employers pursuant to labor contracts with Local 17. The government, however, did not include that type of property allegation in its Hobbs Act charges. Instead, it alleged that the labor was "unwanted, unnecessary, *and* superfluous." Thus, even assuming that the replacement union workers were unwanted by the employer (perhaps because it had to pay higher wages and benefits), and even assuming that the union workers were unnecessary (perhaps because the employer already had a non-union employee performing the job), under no circumstances were the so-called replacement union workers in this case superfluous, because it is undisputed that the employers genuinely wanted and needed the work completed.[5]

Consequently, based on the relevant body of caselaw and the plain language of the property allegations in the indictment, this Court finds that "unwanted, unnecessary, and superfluous labor," as alleged in the indictment in this case, does not include the replacement of a non-union worker with a union worker to perform genuine, needed work. Because the government offered insufficient proof that Kirsch sought to obtain wages for

---

[5]Although it is permissible for an indictment charged in the conjunctive to be proven in the disjunctive, see United States v. Astolas, 487 F.2d 275, 280 (2d Cir. 1973) and United States v. Parker, 165 F. Supp.2d 431, 447-48 (W.D.N.Y. 2001), that is not the circumstance here. The language at issue here is not statutory; it is the grand jury's identification and definition of the property Kirsch allegedly extorted from the victims. Cf. Astolas, 487 F.2d at 280 ("An indictment may charge alternate ways of violating a statute in the conjunctive, and a conviction under such an indictment will be sustained if the evidence justifies a finding that the statute was violated in any of the ways alleged.") And the grand jury specifically defined that property as "the wages and benefits to be paid . . . for unwanted, unnecessary, *and* superfluous labor." All three.

unwanted, unnecessary, and superfluous work in Racketeering Acts 4A and 5A of Count 1 and Counts 2, 5, and 6, the evidence as to the property allegations is insufficient to sustain a conviction on those counts.[6]  Kirsch is therefore entitled to a judgment of acquittal on Counts 5 and 6 under Rule 29.  But Kirsch is not entitled to judgment of acquittal on Counts 1 and 2, as will be discussed further herein.

Kirsch is not entitled to judgment of acquittal on Count 2 because, as alluded to above, the government presented proof at trial that Kirsch conspired to obtain wages and benefits for "unwanted, unnecessary, and superfluous labor" from Amstar Painting.  John Lignos, the Vice-President of Amstar, testified that a Local 17 member named Edward Perkins "asked" him to assign a Local 17 member to operate a compressor for a job in 2003.  Lignos testified that he told Perkins that a Local 17 compressor operator was not needed because the union painters operated the compressor.[7]  After Lignos declined to hire a Local 17 operator, the compressor was damaged, resulting in $14,000 worth of repair and cleanup costs.

Although Kirsch contends that Lignos's testimony is insufficient to sustain his conviction on Count 2, this Court must view the evidence in the light most favorable to the government and credit every inference that the jury may have drawn in the government's favor.  Walker, 191 F.3d at 333.  Applying that standard, the record evidence is sufficient

---

[6]In arguing that the evidence pertaining to Ontario Specialty Contracting (Count 5) and Earth Tech (Count 6) is nonetheless sufficient, the government suggests that the employers possibly having to train Local 17 members to perform necessary work already being performed by trained non-union members would constitute "superfluous labor" because the employer would have to pay twice for training. (Government's Memorandum, Docket No. 620, p. 16.)  Again, however, the government ignores that the work performed would be nonetheless wanted by the employer and necessary to the job and thus not superfluous within the meaning of the property allegations in this indictment.

[7]Operation of the compressor involved simply turning a switch on in the morning and off in the evening.

to support the jury's verdict.  Based on Lignos's testimony and other circumstantial evidence, a reasonable jury could find that Kirsch conspired to violate the Hobbs Act by seeking wages and benefits from Amstar for "unwanted, unnecessary, and superfluous labor" in the form of the compressor-operator position  Judgment of acquittal is therefore precluded on Count 2.

### 3.     Count 1:  Sufficiency of the Evidence

Kirsch also challenges his conviction on Count 1 based on the sufficiency of the evidence unrelated to the property allegations in the indictment.  Kirsch argues that he is entitled to judgment of acquittal because there is insufficient proof that (1) Local 17 was a member of the enterprise, (2) he agreed to the commission of Racketeering Act 5, and (3) he extorted property owned by employers (sub-predicate acts 4B and 5B).

### a.     Local 17's Membership in the Enterprise

Kirsch first argues that the government failed to prove that Local 17 was a member of the enterprise charged in the indictment.  He further contends that without the inclusion of Local 17, there was insufficient proof that the alleged enterprise had the requisite structure and continuity to qualify as an association-in-fact enterprise.

Kirsch's argument is not new.  In pretrial motions, Kirsch and his co-defendants challenged the sufficiency of the allegations in the indictment as they related to the enterprise.  See United States v. Larson, et al., No. 07-CR-304S, 2011 WL 6029985 (W.D.N.Y. Dec. 5, 2011).  In denying the defendants' motion to dismiss, this Court held that the government is not required to prove the establishment of an enterprise to sustain a conviction on Count 1.  Larson, 2011 WL 6029985, at *5 (citing United States v. Applins,

637 F.3d 59 (2d Cir. 2011)).  Rather, "for purposes of establishing a RICO conspiracy, 'the government [is] required to prove only the existence of an agreement to violate RICO's substantive provisions.  Thus, the government necessarily ha[s] to establish that [the defendant] agreed with his criminal associates to form the RICO enterprise.'"  Larson, 2011 WL 6029985, at *5 (citing Applins, 637 F.3d at 74-75, in turn quoting United States v. Benevento, 836 F.2d 60, 73 (2d Cir. 1987)).  Consequently, the government was not required to prove that Local 17 was a member of the enterprise.

Additionally, Kirsch's contention that there was insufficient proof that the alleged enterprise had the requisite structure and continuity to qualify as an association-in-fact enterprise is equally unpersuasive.  As an "association-in-fact enterprise," the Local 17 enterprise need only have (1) a purpose, (2) relationships among those associated with the enterprise, and (3) sufficient longevity to permit the associates to pursue the enterprise's purpose.  See Applins, 637 F.3d at 73 (citing Boyle v. United States, 556 U.S. 938, 946-129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009)); see also United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (describing an association-in-fact enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct").

Viewing the evidence in the light most favorable to the government and drawing all inferences in its favor, this Court finds that the government presented sufficient evidence at trial that the criminal enterprise's identity existed apart from the structure of Local 17. Although Kirsch contends that the only relationship between the defendants was their common membership in Local 17, the government presented sufficient proof that the defendants, although perhaps meeting or knowing each other through their common

13

membership in Local 17, operated together within the criminal enterprise apart from their membership in Local 17.  Membership in Local 17 alone did not bind the defendants. The government introduced independent evidence of the criminal enterprise's purpose (extorting construction employers), the relationships among the associates (roles within the criminal enterprise), and longevity.  Kirsch's request for a judgment of acquittal on this basis is therefore denied.

### b.    Kirsch's Commission of Racketeering Act 5B

With this Court's decision granting Kirsch judgment of acquittal on Racketeering Acts 4A and 5A, Kirsch's conviction on Count 1 now rests solely on the jury's finding that he committed Racketeering Acts 4B and 5B.  Commission of both racketeering acts is required to sustain Kirsch's conviction.  Kirsch argues that the government failed to present sufficient evidence that he was involved in the commission of Racketeering Act 5B, which pertains to the extortion of Earth Tech in relation to a construction project at the Fourth Street Remediation Site in Buffalo, N.Y., in 2005.  Kirsch maintains that the government failed to introduce any direct evidence that he agreed to the commission of the acts taken against Earth Tech, and he contends that the circumstantial evidence presented by the government is insufficient to support his conviction.  This Court disagrees.

Earth Tech employee William Lindheimer testified that he and fellow Earth Tech employee Luther Keyes met with Kirsch and former co-defendant James Minter in a trailer at the Fourth Street Remediation job on July 20, 2005.  During the meeting, Kirsch demanded that the Fourth Street Remediation project be "100% union."  Lindheimer refused this demand but offered a compromise position, which Kirsch refused, stating "we want it all."  According to Lindheimer, Kirsch's tone was "direct and arrogant" but he was

basically cordial and non-threatening.

The day after the meeting, former co-defendant George Dewald gouged Lindheimer's truck and former co-defendant Michael Eddy "belly-bumped" Lindheimer. Two days after the meeting, Minter made an ominous reference to Lindheimer's wife, Tara, and copies of threatening letters ("Dear Tara" letters) were sent to Lindheimer's wife and two other individuals associated with Earth Tech.  Three days after the meeting, Earth Tech employees discovered that the fuel tank of a John Deere loader had been sawed open.

Contrary to Kirsch's argument, the circumstantial evidence presented at trial was not at least as consistent with innocence as with guilt.  The government presented significant circumstantial evidence from which the jury could conclude beyond a reasonable doubt that Kirsch agreed to and/or participated in Racketeering Act 5B.  See United States v. Glenn, 312 F.3d 58, 64 (2d Cir. 2002) ("the prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt"); United States v. Sureff, 15 F.3d 225, 228 (2d Cir. 1994) (finding that conviction may be based on circumstantial evidence).   The jury could directly infer Kirsch's involvement in the racketeering act by considering the evidence demonstrating that immediately after Lindheimer refused Kirsch's all-or-nothing demand, the Fourth Street Remediation project suffered serious repercussions by members of the criminal enterprise.  No inferential leap of any significant distance was required.  Cf. Glenn, 312 F.3d at 70 (noting that "as the inferential leap between the fact and the proposition to be derived grows, the probative value of the [circumstantial] evidence diminishes").  And it is, of course, the jury's role, not this Court's, to weigh the evidence and determine credibility.  Guadagna, 183 F.3d at 129.

Accordingly, Defendant's request for a judgment of acquittal on this basis is denied.

### c.   Ownership of Property

Finally, Kirsch argues that the government failed to sufficiently prove Racketeering Acts 4B and 5B, because it failed to prove that the employers owned the property at issue, *i.e.*, the wages and benefits to be paid pursuant to contracts with Local 17.  According to Kirsch, Local 17 members would have owned the property because they would have earned it by performing work on the respective projects, thereby acquiring a superior claim to the wages and benefits.  This Court disagrees.

Kirsch's argument assumes that the employers *would have* entered into legitimate contracts with Local 17 and that Local 17 members *would have* performed legitimate work, thereby earning the wages and benefits due under the contract.  But Racketeering Acts 4B and 5B charged Kirsch with *Attempted* Extortion under the New York Penal Law.  As such, his extortionate actions must be judged at the time that he took them.  At that time, the employers had not entered into contracts with Local 17 and no Local 17 member was entitled to any wages or benefits.  Rather, the employers owned and held the funds that Kirsch was attempting to secure for Local 17 members through the execution of contracts, *i.e.*, the funds to be paid for wages and benefits if contracts were entered into with Local 17.  Thus, at the time of Kirsch's conduct, the employers owned the property at issue, as "owner" is defined under New York law.  See New York Penal Law § 155.00(5) (defining "owner" as "any person who has a right to possession [of property that is taken, obtained or withheld by one person from another person] superior to that of the taker, obtainer or withholder.)  Kirsch's request for judgment of acquittal on this basis is therefore denied.

16

\* \* \*

Kirsch has failed to establish that insufficient evidence underlies his conviction on Count 1.  His motion seeking a judgment of acquittal on that basis is therefore denied.

## B.    Kirsch's Rule 33 Motion

### 1.    Rule 33 of the Federal Rules of Criminal Procedure

Rule 33 of the Federal Rules of Criminal Procedure provides that a court may grant a motion for a new trial "if the interest of justice so requires."  A district court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and only in 'the most extraordinary circumstances.'"  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be manifest injustice . . . .  There must be a real concern that an innocent person may have been convicted."  Ferguson, 246 F.3d at 134.  A reviewing court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict.  Sanchez, 969 F.2d at 1414 (internal quotation marks omitted).

### 2.    Jury Instructions

Kirsch argues that he is entitled to a new trial because this Court failed to charge the jury with certain instructions in the form he requested and omitted other of his proposed charges in toto.[8]

---

[8]Kirsch also re-asserts the arguments he made under Rule 29 as the basis for a new trial under Rule 30.  For the same reasons already stated, this Court finds that those arguments do not support a finding of "manifest injustice" and are insufficient grounds to order a new trial under Rule 33.  Ferguson, 246 F.3d at 134.

A defendant challenging jury instructions must demonstrate "error and ensuing prejudice."  United States v. Quinones, 511 F.3d 289, 313-14 (2d Cir. 2007) (citation omitted).  Error is found when, "viewed as a whole, [the jury instruction] 'either failed to inform the jury adequately of the law or misled the jury about the correct legal rule.'"  Id. at 314 (citations omitted); see also United States v. Sabhnani, 599 F.3d 215, 247 (2d Cir. 2010).  Kirsch argues that this Court erred by not instructing the jury on the Enmons exception to Hobbs Act and New York Penal Law liability and by not including other requested charges.[9]

This Court fails to detect any error.  First, in a pretrial ruling, this Court fully explained why the Enmons exception to Hobbs Act and New York Penal law liability does not apply in this case.  See United States v. Larson, 807 F. Supp. 2d 142, 151-163 (W.D.N.Y. 2011).  This Court reiterated that ruling at the jury charge conferences after the close of proof.  That being the case, instructing the jury concerning the Enmons exception was not warranted or required.  Second, Kirsch does not elaborate on why the omission of his proposed charges, which he references only by number,[10] constitutes "error and ensuing prejudice."  Quinones, 511 F.3d at 313-14.  Many of these charges are ones that this Court gave, albeit not in the form Kirsch proposed.  Kirsch does not, however, explain why the charges as given were erroneous.  He conclusorily states only that "[a]ll of the requested charges accurately reflect the applicable law and would have formed the basis

---

[9]Kirsch also argues that this Court erred by not instructing the jury on the meaning of "unwanted, unnecessary, and superfluous labor," as that term is used in the indictment in Racketeering Acts 4A and 5A of Count 1 and Counts 2, 5, and 6.  This argument is now moot, however, in light of this Court's resolution of that issue in the context of Kirsch's Rule 29 motion.

[10]The proposed charges are 20, 39, 44, 49, 50, 52, 54, and 56, set forth in Docket No. 426.

for a verdict of acquittal, had the jury been so instructed." (Kirsch's Memorandum of Law, Docket No. 611, p. 25.)  And for those proposed charges that were omitted *in toto*, Kirsch fails to address how the omissions rendered the entire set of jury instructions erroneous. See id. (requiring that jury charges be considered as a whole).  For these reasons, Kirsch has failed to demonstrate that he is entitled to a new trial based on erroneous jury instructions.

\*   \*   \*

For purposes of Rule 33, the jury's verdict is fully supported by competent evidence and nothing Kirsch presents approaches manifest injustice or gives rise to a real concern that an innocent person may have been convicted.  See Ferguson, 246 F.3d at 134. Kirsch is therefore not entitled to a new trial, and his request for one is denied.

## IV. CONCLUSION

For the reasons stated above, Kirsch's Motion for a Judgment of Acquittal, or in the alternative, for a New Trial, is granted in part and denied in part.  The Clerk of Court will be directed to enter a judgment of acquittal on Counts 5 and 6.  Although this Court's ruling concerning the property allegation in Counts 5 and 6 extends to Racketeering Acts 4A and 5A of Count 1 and to Count 2, as fully explained herein, Kirsch is not entitled to a judgment of acquittal on those counts.  Kirsch's conviction on Count 1 is sustained based on the jury's finding that he committed Racketeering Acts 4B and 5B; Kirsch's conviction on Count 2 is sustained because of the evidence relating to Amstar Painting.  Kirsch's motion for a new trial will be denied.

## V. ORDERS

IT HEREBY IS ORDERED, that the portion of Kirsch's Motion for a Judgment of Acquittal, or in the alternative, for a New Trial (Docket No. 610) requesting Judgment of Acquittal is GRANTED in part and DENIED in part, consistent with the foregoing Decision and Order.

FURTHER, that the Clerk of Court is directed to enter a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure for Counts 5 and 6.

FURTHER, that the portion of Kirsch's Motion for a Judgment of Acquittal, or in the alternative, for a New Trial (Docket No. 610) requesting a New Trial is DENIED.


SO ORDERED.


Dated:  March 31, 2015
        Buffalo, New York

                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        Senior United States District Judge